UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEVEN PUTRUS, *et al.*,

      Plaintiffs,

                                Case No. 21-cv-11312

v.                                  Hon. Matthew F. Leitman

WILLIAM MORRISON, *et al.*,

      Defendants.

_____/

## ORDER (1) GRANTING IN PART DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT (ECF No. 106) AND (2) DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS' STATE-LAW CLAIMS

In this action, brothers Steven and Alexender Putrus allege that the City of Detroit and several of its police officers violated their rights under both federal and state law during and after police raids of their businesses and homes on October 22, 2018. (*See* First Am. Compl., ECF No. 38.)  The remaining Defendants in the case have now moved for summary judgment. (*See* Mot., ECF No. 106.)  For the reasons explained below, the Court **GRANTS** the motion with respect to the Putrus brothers' federal claims and **DISMISSES** those claims with prejudice.  In addition, the Court **DECLINES** to exercise supplemental jurisdiction over the Putrus brothers' state-law claims, and it **DISMSISES** those claims without prejudice.  The Putrus brothers are free to pursue those claims in state court.

1

# I

## A

In 2018, the Putrus brothers operated two different businesses in the City of Detroit. The businesses were located next door to one another. The first business was a check cashing business that also sold cell phones. Steven operated the check cashing side of the business; Alexander operated the cell phone side of the business. (*See* Steven Putrus Dep., ECF No. 61-10, PageID.1015-1016.) The check cashing/cell phone business was located at 11935 East Warren Avenue in Detroit. (*See id.*)

Steven also leased the building next door, 11931 East Warren Avenue. (*See id.*, PageID.1016.) In that second building, Steven operated a "medical marijuana" dispensary. (*Id.*, PageID.1017.) Steven acknowledges that at the time he operated the dispensary, he had applied for, but had not yet received, a permit allowing him to sell medical marijuana. (*See id.*, PageID.1017-1018.) According to Steven, at that time, "[n]obody in the [C]ity had a permit," and he believed his operation of the dispensary fell within a "gray area." (*Id.*, PageID.1018.) While the Putrus brothers did not sell marijuana at the check cashing/cell phone business, Steven did store there at least some of the medical marijuana that he was selling at the dispensary next door. (*See id.*, PageID.1020-1021.)

2

**B**

During portions of 2018, officers from the Detroit Police Department (the "DPD") began investigating the Putrus brothers and their businesses. (*See* Morrison Aff. at ¶¶ 4-5, ECF No. 106-5, PageID.2528.)  As part of that investigation, on September 25, 2018, an undercover DPD narcotics officer purchased medical marijuana from the dispensary. (*See id.* at ¶ 4, PageID.2528.)  "In response to [that] undercover buy," Defendant William Morrison, a DPD narcotics officer, "obtained and [helped to execute] a narcotics search warrant for [the dispensary]." (*Id.* at ¶ 5, PageID.2528.)  That raid, which the Court will call the "First Raid," "led to the confiscation of over 26,000 grams of marijuana and several ecstasy pills." (*Id.*)

After the First Raid, Steven was told that his application to operate a medical marijuana dispensary – which had been pending at the time of the First Raid – was denied. (*See* Steven Putrus Dep., ECF No. 61-10, PageID.1017-1018.)  He says that he was told by the City "to close [the dispensary by] October 31st." (*Id.*)

**C**

Defendant Radames Benitez is another DPD officer whose work intersected with the Putrus brothers.  Like Morrison, Benitez worked narcotics on the DPD's major violators unit. (*See* Benitez Dep., ECF No. 106-12, PageID.2670.)  Benitez occasionally "assisted [Morrison] and his crew," but the two officers primarily worked in different "groups." (*Id.*, PageID.2677.)

Benitez was not "involved" in Morrison's investigation into the Putrus brothers in 2018. (*Id.*, PageID.2680.)  But he says that he did happen to receive information about the Putrus brothers that year.  According to Benitez, he was working with an "unregistered confidential informant" at that time, and that informant told him that (1) the check cashing/cell phone business was selling heroin and (2) he (the informant) had personally purchased marijuana from the dispensary without a medical marijuana card. (*See* Morrison Aff. at ¶ 16, ECF No. 106-5, PageID.2530.)

Benitez later learned by pure happenstance that Morrison's team was investigating the Putrus brothers' businesses. (*See* Benitez Dep., ECF No. 106-12, PageID.2678.)  Benitez made that discovery when he showed up at a fast-food restaurant across the street from the Putrus brothers' stores to conduct surveillance for his own independent investigation. (*See id.*)  Once he began his surveillance, he saw other investigators from the narcotics unit "sitting there doing surveillance, too." (*Id.*)  Then, when he "got back to the base," he learned that the other surveillance was part of "Morrison's investigation." (*Id.*)

After learning about Morrison's investigation, he conveyed to Morrison the information from the confidential informant about the sale of heroin from the check cashing/cell phone business and his purchase of marijuana from the dispensary. (*See* Morrison Aff. at ¶ 16, ECF No. 106-5, PageID.2530.)  Notably, the Putrus brothers

have not identified any evidence in the record as to what, if anything, Morrison said to Benitez about his investigation. For instance, they have not cited any evidence that Morrison told Benitez anything about the target of his investigation, about the status of the investigation, and, most importantly, about whether Morrison had any intent to seek or execute a search warrant at the Putrus brothers' properties. And Benitez has denied being told that Morrison would use the information received from the informant in a search warrant affidavit. (*See* Benitez Dep., ECF No. 106-12, PageID.2679.)

**D**

At the time Benitez told Morrison about the information from the informant, Morrison believed Benitez to be "trustworthy" and "honest." (Morrison 02/02/2023 Dep., ECF No. 106-4, PageID.2524.) Morrison "had no reason" to doubt Benitez's credibility at that time. (*Id.*)

While Morrison trusted Benitez, he nonetheless set about to corroborate the information that Benitez passed on to him from the informant. To that end, he conducted additional surveillance of the Putrus brothers' businesses on October 17, 2018. (*See* Morrison Aff. at ¶ 17, ECF No. 106-5, PageID.2530.) While conducting that surveillance, he saw a woman enter the check cashing/cell phone business. (*See id.*) She stayed "inside of [that] location for merely a minute or so before exiting [] and leaving the area." (*Id.*) Based on Morrison's experience, he "believe[d] the

5

subject's trip … was inconsistent with the reasonable time needed for a check to be verified and cashed." (*Id.*)  Likewise, during additional surveillance on October 18, 2018, Morrison saw another person "enter the check cashing[/cell phone business] and approach the counter before having an interaction with Steven Putrus[,] who was behind [] protective glass.  The suspected buyer left the counter of the location after being [there] for only 30 seconds or so." (*Id.* at ¶ 21, PageID.2530.)  Morrison concluded that "the mere seconds spent by this suspected buyer inside of the check cashing[/cell phone] location was [] inconsistent with the average time to process a check." (*Id.*)  According to Morrison, this "'short-stay type' of activity [was] consistent …with [Morrison's] experience during surveillance of narcotics complaint locations." (*Id.*)  It was also consistent with earlier observations of similar "short stay" visits that Morrison observed at the check cashing/cell phone location. (*See id.* at ¶ 7, PageID.2528.)

The physical appearance of the individuals entering the check cashing/cell phone business also led Morrison to believe that they were purchasing drugs. Morrison testified that the individuals had "sickly" and "unclean appearances," and that, "after being surrounded by [drug addicts] doing [] investigations for years upon years," they "looked like drug addicts" to him. (Morrison 02/02/2023 Dep., ECF No. 106-4, PageID.2483.)

6

**E**

Based upon his investigation into the Putrus brothers' businesses, including his personal observations and the information he received from Benitez, the informant, Morrison decided to seek a warrant to search the check cashing/cell phone business, the dispensary, and the Putrus brothers' residences.  After making that decision, he drafted an affidavit to be submitted in support of the warrant request.  (*See* Warrant and Morrison Aff., ECF No. 106-5.)  The Putrus brothers have not identified any evidence in the record that Benitez was aware that Morrison intended to seek a search warrant or that Morrison had drafted an affidavit in support of his warrant request.

Morrison's affidavit, worth quoting at length, detailed the investigation that Morrison had undertaken into the Putrus brothers, described the findings of that investigation, and included the information from the confidential informant that Benitez had provided to Morrison.  In relevant part, the affidavit provided as follows:

> 1)     The Affiant is a 17 year member of the Detroit Police Department and has been investigating narcotics related crimes while assigned to the Narcotics Enforcement Section/Major Violators Unit for the last 12 years. Affiant has received numerous hours of training in narcotics identification, techniques of manufacturing, sales, trafficking and undercover techniques from the Detroit Police Department and other agencies. Affiant, from years of field experience, is also familiar with controlled substances in their various forms, packaging and distribution tactics of controlled substances and

Affiant is able to identify such controlled substances by sight.

2)      Affiant has prepared this search warrant in response to an ongoing investigation to ascertain the identity of the operators of the commercial unit located at 11931 E. Warren (target location # 1) [the medical marijuana dispensary].

3)      11931 E. Warren is an unmarked unit of the Park Side Plaza strip-mall. This particular unit has no markings/signage and the address has been removed from above its entry door. The location gives the appearance of being a vacant unit in the strip mall but is functioning solely for the purpose of illegal sales of marijuana [….]

4)      Marijuana was purchased from the 11931 E. Warren location by an undercover, fellow DPD narcotics officer on 9/25/2018.

5)      In response to the undercover buy that was made on 9/25/2018, Affiant obtained and was involved in the execution of a narcotics search warrant for 11931 E. Warren. The search warrant was executed on 09/26/2018 and led to the confiscation of over 26,000 grams of marijuana and several ecstasy pills. A subject was arrested at the location for Delivery of a Controlled Substance after marijuana was again sold to an undercover police officer moments prior to the raid.
[….]

7)      On 10/08/2018, Affiant returned to the area of 11931 E. Warren and performed undercover surveillance. Affiant was able to observe a nearly continuous amount of cars coming and going from the parking lot of the location. Affiant notated observations that were made during approximately a 10 minute time frame. During this span of time, at least 13 suspected buyers made quick trips to the unit of 11931 E. Warren. The suspected buyers entered

8

the front door of the target location and each of them remained inside for an average of merely 1-3 minutes before they emerged from same and left the area.  The activity ls consistent with confirmed "short stay" narcotics activity that Affiant has observed during countless prior surveillance operations, including prior surveillance at this very location. Executing search warrants based on observations of this type of activity has led to countless narcotics related arrests and seizures. […]

8)     The observations made on 10/08/2018 lead Affiant to believe that 11931 E. Warren has resumed selling controlled substances. The very steady activity reveals the potential for the operators of the location to be earning thousands of dollars in illegal narcotics proceeds.

9)     On 10/8/2018, Affiant was also able to observe what appeared to be the same subject that was arrested on 9/26/2018 for Delivery of Marijuana , … opening the front door for and greeting suspected buyers as they entered the 11931 E. Warren location. During continued surveillance on the same day, Affiant observed the same subject, on two occasions, walk back-and forth between that location and the check cashing[/cell phone] business (target location #2) that is located in the unit directly next door (11935 E. Warren).  Affiant also observed at least 2 suspected buyers make short trips to the 11935 E. Warren location before entering the 11931 location.

On 10/1/2018, Affiant observed continued heavy suspected narcotics activity at the target location of 11931 E. Warren.  During a span of about only 5 minutes of surveillance, Affiant was able to observe 7 suspected buyers make short trips to the unit. [….]

9

10)   In the following days, Affiant continued periodic surveillance on the location of 11931 E. Warren and discovered that the hours of operation at the unit that is selling marijuana mirrored the exact hours of the check cashing[/cell phone] business located at 11935 E. Warren. Both of the locations would open at about 10:00am and close around 7:00pm. Affiant also observed that although vehicles carrying suspected buyers to the 11931 E. Warren location were consistently coming and going, 2 vehicles were routinely observed parked in the parking lot for the duration of the open hours of the 11931 and 11935 E. Warren target locations. The vehicles were … registered to Steven Putrus and … Alexander Putrus.

11)   On 10/15/2018, Affiant began investigating to determine the operator of the check cashing business located at 11935 E. Warren. By performing a query of his name through a business entity search that is provided by the Michigan Department of Licensing and Regulatory Affairs (LARA), it was revealed that Steven Putrus was the president of "Cash Point Check Cashing Inc.," the governing corporation for the check cashing business located at target location #2, 11935 E. Warren. The search also revealed that the same subject, Steven Putrus, formed a company in 2018 for the known narcotics location of 11931 E. Warren (target location #1) by the name of "SP Business Center LLC." Further investigation of the 11935 E. Warren location using DPD police report records revealed prior police reports in which reporting officers had contact with both Steven and Alexander Putrus who were working behind the glass of the check cashing business […].

12)   In the evening on 10/15/2018, Affiant and crew members went to the area of target locations 1&2 and performed undercover surveillance as both closed simultaneously at approximately 7pm. Suspected lookouts/guards from the 11931 E. Warren unit stood by while others that exited the business kept watch in the parking lot as Steven and Alexander Putrus were observed

10

closing and leaving the check cashing business unit of 11935 E. Warren. [….]

[….]

15)   On   10/16/2018,   Affiant   again   performed surveillance on 11931 & 11935 E. Warren and observed both of the locations closing at the exact same time.

16)   In the past week, Affiant received additional information regarding narcotics activity at 11931 & 11935 E. Warren. The information was revealed after a fellow DPD narcotics officer, P.O. R. Benitez, was found to be performing a concurrent surveillance/investigation on the same two locations. P.O. Benitez is working in conjunction with an unregistered confidential informant and he relayed the following specific information that the informant provided:

- That the check cashing unit has been selling heroin for years.
- That the informant has recently been inside of the check cashing unit to accompany someone and witnessed them purchase heroin from a heavy-set Arabic male that was behind the counter.
- That it's known in the neighborhood that Arabic/Chaldean brothers own or run the check cashing store and an illegal marijuana dispensary that is located next door.
- That the informant has recently purchased marijuana from 11931 E. Warren, twice without a medical marijuana card.

17)   On 10/17/2018, Affiant was in the area of 11931 & 11935 E. Warren performing surveillance when a pedestrian B/F/40's suspected buyer was observed entering the check cashing store and approaching the counter. The subject was inside of the location for merely a minute or so before exiting same and leaving the area. Affiant believes the subject's trip to the location was

inconsistent with the reasonable time needed for a check to be verified and cashed.

18) 1n the evening of 10/17/2018, Affiant returned to the area of 11931 & 11935 E. Warren to perform additional surveillance. On this date, both locations were again observed closing at the same time. Affiant watched as several subjects exited the 11931 E. Warren unit (location of marijuana sales) and a large B/M/40's 6'03" tall, 350 lbs, appeared to take up a position in the parking lot as an apparent look-out/guard. An unknown, stocky, shorter B/M that exited 11931 E. Warren locked the door of the unit using a set of keys. After locking the door, he went and stood In front of the door to the check cashing unit (11935 E. Warren) while Alexander Putrus exited same, lowered an interior security gate and locked the door to the check cashing unit. Affiant then observed the unknown B/M that locked the door to 11931 E. Warren hand what appeared to be the same set of keys over to Alexander Putrus before Putrus got into his truck and left the area towards home.

[….]

20) On the morning of 10/18/2018, Affiant again performed surveillance on 11931 & 11935 E. Warren. Upon arrival in the area, the check cashing unit was not yet open. Shortly thereafter, Steven and Alexander Putrus arrived in Steven Putrus' GMC Yukon. Steven Putrus then walked over and opened the front door & interior security gate of the check cashing unit (11935) using keys. Steven and Alexander Putrus entered the check cashing location. A few minutes passed and Affiant then observed Alexander Putrus activate the location's open sign and exit the check cashing unit with keys in hand before walking next door and unlocking the front door and interior security grate of 11931 E. Warren (location of marijuana sales). Alexander Putrus was followed into the 11931 location by the same large B/M that appeared to be

operating as a lookout the night before. After remaining inside of the location for nearly 15 minutes, Alexander Putrus exited the 11931 unit and re-entered the check cashing unit. The large B/M exited with him and kept watch as Alexander Putrus walked from unit to unit.

21)    Meanwhile, as Alexander Putrus was still inside of the 11931 unit, I observed a pedestrian B/M/60's suspected buyer enter the check cashing unit and approach the counter before having interaction with Steven Putrus who was behind the protective glass. The suspected buyer left the counter of the location after being at same for only 30 seconds or so. The suspected buyer then exited the business and left the area. Similar to observations made the day prior, the mere seconds spent by this suspected buyer inside of the check cashing location was also inconsistent with the average time to process a check. The "short-stay type" of activity is consistent, however, with Affiant's experience during surveillance of narcotics complaint locations.

22)    On 10/20/2018, Affiant performed surveillance on 11931 & 11935 E. Warren and observed the same, aforementioned suspected look-out/guard entering & exiting the check cashing location and also interacting with Steven Putrus. Affiant also observed an occasion where the guard took up position in the parking lot to watch over Steven Putrus as he exited the check cashing location and retrieved a brown paper bag from the rear seat area of his GMC Yukon before returning to the check cashing location. The contents of the bag appeared to be rectangular and block like, consistent with the size and shape of a large stack of currency.

23)    On 10/20/2018, Affiant observed a tall B/M/40's suspected buyer that arrived in a rusty Dodge Dakota enter the check cashing location. After briefly being inside, Affiant observed Steven Putrus exit the check cashing unit with the suspected buyer following, before pointing at the front door of 11931 E. Warren and walking over to same

13

and holding the door open for the suspected buyer to enter. The suspected buyer emerged from the marijuana sales unit moments later and left the area. Steven Putrus remained inside of 11931 E. Warren for a total of 7 minutes before re-emerging and going back into the check cashing unit.

24)   On 10/21/2018, Affiant observed that the check cashing location was not open and listed "Closed" in the Sunday slot of a window sign that displayed the business hours of the location. Affiant noticed that on this date, the marijuana sales unit of 11931 was not open either, Affiant believes that this observation further shows a nexus between the units of 11931 & 11935 E. Warren.

25)   During the above mentioned September raid on 11931 E. Warren, over $13,000 was seized from the location. The amount seized reveals that the operation is making considerable profits.

26)   Affiant knows, from training and experience, that large scale narcotics dealers/suppliers often store stashes of narcotics proceeds and sometimes even more narcotics at their residences for safekeeping. Storage of large amounts of currency at their residences also help the avoidance of IRS reporting requirements that would apply if same was to be deposited into a bank or other financial institution. It's also Affiant's experience that dealers often sell controlled substances in the inner city but reside and store their narcotics proceeds and lavish purchases in suburban cities to avoid law enforcement detection and to mitigate the risk of robbery by rival criminals.

[....]

29)   Affiant believes that the above listed facts and observations show probable cause that controlled substances and narcotics proceeds will be found in each of the four listed target locations and Affiant seeks to search for same.

14

(*Id.*)

According to Morrison, search warrant affidavits like the one he drafted in this case were subject to multiple levels of review.  He explained that such affidavits would typically be reviewed by his sergeant and possibly the "lieutenant of the unit" as well. (Morrison 02/08/2024 Dep., ECF No. 106-6, PageID.2543.)  In addition, affidavits would be presented to an assistant prosecutor for review. (*See id.*)  In Morrison's experience, the prosecutor's office would reject warrant applications where the facts set forth in the supporting affidavits did not "ris[e] to the level of probable cause." (*Id.*, PageID.2535.)

Here, Morrison presented his affidavit and a proposed warrant to Wayne County Assistant Prosecuting Attorney Elizabeth Van Marcke for review before those documents were presented to a judge.  Van Marcke concluded that the affidavit did provide sufficient probable cause to support the requested search warrant.  She approved and signed the affidavit and proposed warrant on the bottom of every page. (*See* Warrant and Morrison Aff., ECF No. 106-5.)  She then submitted the affidavit and proposed warrant to a judge of the 36th District Court for the State of Michigan. That judge also found that the affidavit set forth sufficient probable cause, and the judge signed each page of the warrant and affidavit. (*See id.*)  The warrant specifically provided that the DPD could search four locations: the check

cashing/cell phone business, the dispensary, and the home of each Putrus brother. (*See id.*)

<center>**F**</center>

After both the prosecutor and state-court judge approved and signed the warrant, Morrison oversaw a raid on the check cashing/cell phone business, the dispensary, and the Putrus brothers' homes (the "Second Raid"). The Second Raid occurred on October 22, 2018. (*See* 02/02/2023 Morrison Dep., ECF No. 106-4, PageID.2457.)

During the Second Raid, "a large quantity of marijuana was found at both" the check cashing/cell phone business and the dispensary. (*Id.*, PageID.2488.) The officers also found what some officers believed to be cocaine and/or heroin in a cardboard box at the check cashing/cell phone business. (*See id.*, PageID.2488, 2491.) The box had "a knotted baggy with [a] white powdery substance in it," and Morrison believed, based upon his experience as a narcotics investigator, that that substance "appeared to be cocaine." (*Id.*, PageID.2491.) Officers also found "some other powdery substances" at the check cashing/cell phone business, including "[t]wo pound jars or jugs with powdery substances" that some officers suspected were narcotics. (*Id.*) Those jugs were found inside of a safe behind the counter of the check cashing/cell phone business. (*See id.*)

<center>16</center>

Officers on the scene of the Second Raid did not have the proper equipment to conduct a field test of the suspicious substances that they found.  So they contacted the Roseville Police Department.  That department had a "TruNarc" machine that could perform a field test of those substances. (*Id.*, PageID.2492-2493.)

Roseville officers brought the TruNarc machine to the scene and field tested the substances. (*See id.*)  The field test did not return a positive result for illegal drugs. (*See id.*, PageID.2494.)  That result did not surprise at least some of the officers on the scene.  Those officers speculated that the substances were not actually illegal drugs, but were what is known as "cut" – chemical agents that are used to cut recreational drugs with something less expensive than the drug itself.[1] (*See id.*, PageID.2499.)

Even though the TruNarc field test did not return a positive test for narcotics, the officers on the scene of the Second Raid still arrested both Steven and Alexander Putrus. (*See* Alexander Putrus Dep., ECF No. 106-9, PageID.2564; Steven Putrus Dep., ECF No. 106-10, PageID.2609.)  As the Putrus brothers' counsel has candidly acknowledged, the officers had probable cause for those arrests based upon their

---

[1] The Putrus brothers contend that the white powdery substances the police found were neither illegal drugs nor "cut," but were instead room deodorizer that the Putrus brothers would sell to their customers at the check cashing/cell phone business. (*See* Steven Putrus Dep., ECF No. 84-10, PageID.1038-1039.)

17

discovery of large quantities of marijuana.[2] The officers also seized over $300,000 in cash and other property of the Putrus brothers, including a handgun, four digital scales, and a 2018 GMC Yukon truck. (*See* First Am. Compl. at ¶ 61, ECF No. 38, PageID.487, which includes photograph of the October 22, 2018, search warrant inventory list).

## G

After the Putrus brothers were arrested, DPD officers brought the powdery substances found during the raid to the DPD laboratory for a second round of testing by the DPD in-house lab. (*See* Morrison 02/02/2023 Dep., ECF No. 106-4, PageID.2499-2502.) During that testing, some of the recovered substances tested positive for controlled substances. More specifically, the testing indicated that the recovered substances included the following: 2,207 grams of heroin, 7,495.2 grams of cocaine, 7,818 grams of marijuana, and over 5,000 grams of ecstasy. (*See id.*, PageID.2509; *See also* ECF No. 106-8.)

## H

Following the positive test results from the DPD in-house lab, Defendant Philip Rodriguez, a Task Force Officer with the United States Drug Enforcement Administration (the "DEA") (*see* Rodriguez Aff. at ¶ 2, ECF No. 110-5,

---

[2] Counsel made that concession on the record during the hearing on Defendants' second motion for summary judgment. That hearing occurred on November 14, 2025.

18

PageID.2778), asked a United States Magistrate Judge of this Court to sign and issue a criminal Complaint charging the Putrus brothers with conspiracy to distribute and to possess with intent to distribute controlled substances. Rodriguez submitted an affidavit in support of the requested criminal Complaint. (*See id.*, PageID.2778-2782.) In that affidavit, Rodriguez told the Magistrate Judge that:

- DPD officers "conducted an undercover purchase[] of marijuana" from the dispensary on September 25, 2018, and that a raid of the dispensary on September 26, 2018, led to the seizure of "26,000 grams of marijuana" and "several ecstasy pills." (*Id.* at ¶ 3, PageID.2779.)

- Morrison had conducted detailed surveillance of the dispensary and check cashing/cell phone business over multiple days and "observed several suspected narcotics transactions take place" at those locations. (*Id.* at ¶¶ 4, 7, PageID.2779-2781.) During one of these periods of surveillance, Morrison "observed approximately seven individuals within the span of 5 minutes make short stays to and from the [dispensary]." (*Id.* at ¶ 4, PageID.2780.) On another occasion, Morrison saw "at least 13 persons ma[ke] quick trips in and out of the [dispensary]." (*Id.*, PageID.2779.) "Based on [Morrison's] experience and training along with the prior search warrant execution … Morrison concluded that this activity was consistent with narcotics trafficking." (*Id.*)

19

- "Morrison [had] received information from a fellow narcotics officer that [the check cashing/cell phone business] ha[d] been selling heroin for years and a Detroit Police Department Confidential Informant had recently been inside the [check cashing/cell phone business] and observed heroin being sold from behind the counter by a heavy-set Arabic male." (*Id.* at ¶ 7, PageID.2781.) This is the information that came to Morrison from Benitez.

- DPD officers conducted a raid of the check cashing/cell phone and dispensary locations on October 22, 2018 (*i.e.*, the Second Raid). During that raid, "[b]oth Steven and Alexander Putrus were arrested," and several substances were seized from the check cashing/cell phone business. (*Id.* at ¶ 8, PageID.2782.)

- Those substances seized from the check cashing/cell phone business subsequently tested positive for cocaine, heroin, marijuana, and ecstasy. (*See id.*)

A Magistrate Judge of this Court concluded that Rodriguez's affidavit established probable cause to believe that the Putrus brothers had committed the offenses of conspiracy to distribute and to possess with intent to distribute controlled substances, and the Magistrate Judge signed a criminal Complaint charging them with those offenses on October 24, 2018. (*See* Crim. Compl., ECF No. 110-5, PageID.2777.)

These charges remained pending against the Putrus brothers for approximately six months.  During that time, the powdery substances seized from the check cashing/cell phone business during the Second Raid were tested a third time at a lab associated with the DEA.  Those tests returned a negative finding for illegal drugs. (*See* DEA Test Results, ECF No. 110-7.)  Based in part on that negative test result, all criminal charges were dismissed against the Putrus brothers. (*See* Crim. Dismissal Order, ECF No. 110-7.)

## I

Several years after charges were brought, and then dropped, against the Putrus brothers, the DPD's internal affairs department and the Federal Bureau of Investigation began investigating the DPD's major violators unit in what became known as "Operation Clean Sweep."  That investigation uncovered significant corruption and wrongful acts by several officers in that unit.  While Operation Clean Sweep did not discover any specific wrongdoing by Officer Morrison, the investigation did uncover significant wrongdoing by Officer Benitez.  Based on the investigation's findings, on August 21, 2020, Benitez was suspended for, among other things, "engaging in misconduct which constituted of falsifying information contained in search warrants that he authored."[3] (08/21/2020 Benitez Memo., ECF

---

[3] The Putrus brothers have not identified any findings from Operation Clean Sweep that relate to the investigation into them.

21

No. 110-9, PageID.2827.)  In addition, Operation Clean Sweep found that the DPD frequently used confidential informants in ways that violated the DPD's own policies and procedures and that did not allow for sufficient verification of the information provided by those informants. (*See* Operation Clean Sweep Excerpt, ECF No. 110-10.)

## II

### A

The Putrus brothers filed this action on June 3, 2021, against the City of Detroit, Officers Morrison, Benitez, and Rodriguez, and several other officers involved in their investigation, arrest, and prosecution. (*See* Compl., ECF No. 1.) The operative pleading is the First Amended Complaint that the Putrus brothers filed on June 1, 2022. (*See* First Am. Compl., ECF No. 38.)  The following claims from that pleading remain against the following Defendants[4]:

- Count I, Unreasonable Search and Seizure pursuant to 42 U.S.C. § 1983, brought against Defendants Morrison and Benitez;

- Count II, Unlawful Detention, Arrest pursuant to 42 U.S.C. § 1983, brought against Defendants Morrison and Benitez;

---

[4] The First Amended Complaint, as filed, contained other claims against other Defendants.  On November 19, 2024, the Court granted summary judgment in favor of all of the Defendants except for the claims brought against the City of Detroit and Officers Morrison, Benitez, and Rodriguez. (*See* Order, ECF No. 100.)

- Count III, Malicious Prosecution pursuant to 42 U.S.C. § 1983, brought against Defendants Morrison, Benitez, and Rodriguez;

- Count IV,[5] Custom or Practice of Tolerating the Violation of Federal Rights pursuant to 42 U.S.C. § 1983, brought against the City; and

- Counts V and VI, state-law claims for malicious prosecution and the intentional infliction of emotional distress.

The Court will describe these claims in much further detail below.

**B**

On May 12, 2025, Morrison, Benitez, Rodriguez, and the City filed a motion for summary judgment. (*See* Mot., ECF No. 106.)  In that motion, the individual Defendants assert the defense of qualified immunity, and all of the Defendants attack the claims on the merits. (*See id.*)  The Court held a hearing on the motion on November 14, 2025.

**C**

Before turning to Defendants' motion, the Court pauses to address an issue related to the "unregistered confidential informant" who allegedly provided

---

[5] The First Amended Complaint also includes a second claim that is titled "Count IV."  That second Count IV is titled "42 U.S.C. § 1983 – Denial of Due Process."  At the hearing on Defendants' second summary judgment motion, counsel for the Putrus brothers conceded that if the Putrus brothers' other Fourth Amendment claims fail, then this claim would fail as well.  The Court will therefore not conduct an independent analysis of this Count.

information about the Putrus brothers' stores to Benitez. The Putrus brothers have long contended that that informant did not exist and that Benitez simply made him up. To that end, they have made a substantial effort through discovery in this litigation to discover whether the informant was real and to determine the informant's identity. As described below, the Defendants have not been able to confirm the informant's existence or to determine his identity.

The Putrus brothers first tried to learn information about the informant by asking Benitez about the informant at Benitez's deposition. Benitez said that he did not remember anything specific about the informant. (*See* Benitez Dep., ECF No. 106-12, PageID.2678-2679.) He could not even recall whether the informant was a man or a woman. (*See id.*, PageID.2679.)

Notably, Benitez confirmed that if he was working with the confidential informant he mentioned to Morrison, then there would have been "some information, an activity log or paperwork in a file" reflecting that work. (*Id.*, PageID.2678.) Benitez explained that when he was "working with [a confidential informant] or if [he received] a call or anything [from the informant], it [would] be logged in the log sheet." (*Id.*) However, Benitez could not produce his files that presumably contained information about the informant because, according to him, his records had been "confiscated" by the DPD's internal affairs department as part of Operation Clean Sweep. (*Id.*)

Based on Benitez's testimony, the Putrus brothers then sought Benitez's records from the DPD. The DPD produced some of Benitez's documents in response to that request. But none of the "documentation" produced by the DPD corroborates the existence of the confidential informant.[6] (Resp., ECF No. 110, PageID.2722; Mot. For Adverse Inference, ECF No. 93, PageID.2092.) While those records did reflect "numerous references to unknown people and phone numbers" that presumably were informants for Benitez, "there was not a single reference to any Confidential Informant Benitez used and/or his alleged notes from the Putrus investigation." (Mot. For Adverse Inference, ECF No. 93, PageID.2093.)

For the purposes of this motion, and taking the historical facts in the light most favorable to the Putrus brothers, a jury could reasonably conclude that the informant never existed – on the basis that if he did exist, his identity and/or his cooperation would have been reflected in Benitez's documents. *See Metris-Shamoon v. City of Detroit*, 545 F.Supp.3d 506, 517–18 (E.D. Mich. 2021) (finding that jury could find that officer-affiant lied about having a confidential informant where his department's files did not contain records reflecting the informant's existence that would reasonably have been expected to be in the files). Thus, the Court's analysis of

---

[6] Defendants have responded that it is possible that Benitez's documents were destroyed pursuant to the department's three-year document retention policy, but Defendants have not persuaded the Court that documents were destroyed pursuant to that policy.

Defendants' motion below will proceed from the basis that the informant never existed and that Benitez lied to Morrison about the existence of the informant.

### III

### A

Under Federal Rule of Civil Procedure 56, a movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 312, 326–27 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* But "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52.

### B

As noted above, Defendants have moved for summary judgment based, in part, on qualified immunity. "Qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Brown v.*

26

*Chapman*, 814 F.3d 447, 457 (6th Cir. 2016) (internal quotation marks omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "This immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions,' 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). "Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).

Once a defendant raises a qualified immunity defense, the "plaintiff bears the burden of showing that [the] defendant is not entitled to qualified immunity." *Jacobs*, 915 F.3d at 1039. "A qualified-immunity inquiry involves two questions: whether defendants violated a constitutional right and whether that right was clearly established." *Brown*, 814 F.3d at 457. "These questions may be answered in any order; if either one is answered in the negative, then qualified immunity protects the official from civil damages." *Id.*

With respect to the clearly-established prong of the qualified immunity analysis, a "defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite [such] that any reasonable official in the defendant's shoes would have understood that he was violating it. In

27

other words, existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate." *Wenk v. O'Reilly*, 783 F.3d 585, 598 (6th Cir. 2015) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2012)). Stated another way, a rule is clearly established for purposes of qualified immunity only if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 577 U.S. at 11 (citation omitted). The rule "must be particularized to the facts of the case." *Id*. (citation omitted). That is why "'a body of relevant case law' addressing similar facts 'is usually necessary' to show a violation of a clearly established rule." *Id*. (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). This standard "sets a high bar because it requires a plaintiff to identify with a 'high degree of specificity' the legal rule that a government official allegedly violated." *Beck v. Hamblen Cnty., Tenn.*, 969 F.3d 592, 599 (6th Cir. 2020) (quoting *Wesby*, 583 U.S. at 63)).

## IV

### A

The Court begins with the claim for illegal search and seizure in violation of the Fourth Amendment in Count I of the First Amended Complaint. As the Court clarified with counsel for the Putrus Brothers at the hearing on Defendants' second summary judgment motion on November 14, 2025, this claim is brought against Benitez and Morrison, and the theory of liability for each officer is different. The

28

claim against Benitez is that (1) he fabricated the existence of an informant and falsely told Morrison that the informant had purchased marijuana at dispensary without a medical marijuana card and had observed the check cashing/cell phone business selling heroin and (2) that false story from Benitez was included in the affidavit that Morrison submitted to the state court judge in support of his application for a warrant to search the Putrus brothers' businesses and homes, and (3) the false story in the affidavit misled the state-court judge into finding probable cause sufficient to support the requested search warrant.

The claim against Morrison is that (1) he recklessly included Benitez's false account of the informant's drug purchase and other observations in his search warrant affidavit without verifying that the informant's account was accurate and/or that the confidential informant existed and was trustworthy and (2) the inclusion of the fake information from Benitez misled the state court judge into issuing the warrant for the search of the Putrus brothers' businesses and homes.

Officers Benitez and Morrison both invoke qualified immunity with respect to this claim.

**B**

The Putrus brothers have failed to overcome the qualified immunity defenses put forward by Benitez and Morrison.

**1**

In the qualified immunity section of their response to Defendants' motion for summary judgment, the Putrus brothers identify the Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154 (1973), as the clearly established federal law on which their unlawful search and seizure claim is based. (*See* Resp., ECF No. 110, PageID.2744.) "In *Franks*, the Supreme Court held that a search warrant must be voided … if a defendant shows by a preponderance of the evidence that a warrant affidavit includes a false statement made knowingly and intentionally or with reckless disregard for the truth and if, with the affidavit's false material excluded, the affidavit is insufficient to establish probable cause." *United States v. Henson*, 848 F.2d 1374, 1381 (6th Cir. 1988) (citing *Franks*, 438 U.S. at 155–56). Based on that holding, "[a]n investigator may be held liable under § 1983 for making material false statements either knowingly or in reckless disregard for the truth to establish probable cause for an arrest" or search. *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003).

"To overcome an officer's entitlement to qualified immunity [for a claimed *Franks* violation], [], a plaintiff must" satisfy two elements. *Id*. First, he must make a "substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth." *Id*. This is a "demanding standard." *Butler v. City of Detroit*, 936 F.3d 410, 418 (6th Cir. 2019). To satisfy it, a plaintiff must show

that an officer who submitted an affidavit "subjectively entertain[ed] serious doubts" about the veracity of its contents or was aware of "circumstances evincing obvious reasons to doubt the veracity of the allegations." *United States v. Cican*, 63 F. App'x 832, 836 (6th Cir. 2003).[7] A plaintiff demonstrates that an officer entertained serious doubts "when, for example, he presents proof that at the time the officer swore out the affidavit, she knew of or possessed information that contradicted the sworn assertions." *Butler*, 936 F.3d at 419.

Second, a plaintiff opposing a qualified immunity defense to a *Franks* claim must show "that the allegedly false or omitted information was material to the finding of probable cause." *Butler*, 936 F.3d at 418. "In other words, [a plaintiff] must show that the judge would not have issued the warrant without the allegedly false material." *Id.*

**2**

Morrison is entitled to qualified immunity on the Putrus brothers' search and seizure claim because the brothers have not made a "substantial showing" that he "stated a deliberate falsehood or showed reckless disregard for the truth [of any statement in his affidavit]." *Butler*, 936 F.3d at 418 (quoting *Vakilian*, 335 F.3d at

---

[7] *See also Griffin v. City of Detroit*, No. 92–2062, 1993 WL 239069, at *4 (6th Cir. June 30, 1993) (applying the test for reckless disregard set forth in text above); *Liptak v. City of Niles, Ohio*, 198 F.3d 246 (6th Cir. 1999) (TABLE), 1999 WL 1045100, at *4 (6th Cir. Nov. 10, 1999) (same); *United States v. Whitley*, 249 F.3d 614, 621 (7th Cir. 2001) (same).

517).  As an initial matter, the Putrus brothers do not appear to contend, and have certainly not presented any evidence, that Morrison deliberately made any false statements in his affidavit.  Instead, they claim that he recklessly included in his affidavit the false information from the informant that he received from Benitez.

But they have failed to make a substantial showing that Morrison was reckless.  They have not, for instance, "present[ed] proof that at the time [Morrison] swore out the affidavit, [he] knew of or possessed information that contradicted [his] sworn assertions." *Id*. at 419.  Nor have they identified sufficient "circumstances" that would have given him "obvious reasons to doubt the veracity of the allegations." *Cican*, 63 F. App'x at 836.  For example, they have not pointed to any specific facts, known to Morrison at the time he drafted the affidavit, that should have caused him to question Benitez's credibility as a general matter.  Likewise, they have not identified any facts that should reasonably have caused Morrison to question Benitez's particular report about the confidential informant in this case.  Rather, they argue in broad strokes that Morrison must have known about Benitez's history of falsifying informant information because they worked in the same unit.  But they offered nothing to contradict the evidence that Morrison and Benitez were in different "groups" and that Benitez assisted Morrison's group only occasionally. (Benitez Dep., ECF No. 106-12, PageID.2670.)  Simply put, the Putrus brothers did not present sufficient evidence to undermine the reasonableness of Morrison's belief

32

that Benitez was generally "trustworthy" and "honest" and that he (Morrison) had "no reason" to doubt the veracity of information shared by Benitez. (Morrison 02/02/2023 Dep., ECF No. 106-4, PageID.2524.)  For all of these reasons, the Putrus brothers failed to make the "substantial showing" required to overcome Morrison's qualified immunity defense to the search and seizure claim.[8]

**3**

The Putrus brothers have also failed to overcome Benitez's qualified immunity defense – albeit for a different reason: they have not shown that Benitez violated clearly established federal law.  To be sure, *Franks* clearly establishes that an officer may not knowingly or recklessly make false statements in a search warrant affidavit.  But the Putrus brothers do not contend that Benitez did that.  Instead, as noted above, they claim that Benitez made false statements to Morrison and that those statements later ended up in Morrison's search warrant affidavit.  While it is certainly possible for an officer to be held liable under a *Franks* theory even if he

---

[8] In the Court's analysis above, the Court repeatedly refers to the Putrus brothers' failure to identify evidence in the record.  The Court focuses on that failure because it was the Putrus brothers' obligation to identify evidence in the record supporting their claims. *See*, *e.g.*, *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 905 F. Supp. 2d 814, 830 (S.D. Ohio 2012) (explaining that "[t]he court has no duty to comb the record for facts to support [a party's claim]" and that "a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties"), *aff'd sub nom. Pharos Cap. Partners, L.P. v. Deloitte & Touche*, 535 F. App'x 522 (6th Cir. 2013)

did not personally make false statements in a search warrant affidavit, *see, e.g.*, *McCallum v. Geelhood*, 742 F. App'x 985, 989 (6th Cir. 2018) (holding that officer was not entitled to qualified immunity where officer reviewed warrant affidavit drafted by a second officer, recognized that it contained false statements, and knew that it would be submitted in support of a warrant request), the Putrus brothers have not cited any case in which any court has held a non-affiant officer liable on a *Franks* theory where, as here, the plaintiff has failed to directly connect the officer to search warrant application process.

As set forth in detail above, the Putrus brothers have not identified any evidence that Benitez drafted or reviewed Morrison's affidavit. Nor have they cited evidence indicating that Benitez knew that Morrison would use the information concerning the informant in a search warrant affidavit. Indeed, they have not pointed to evidence that Benitez knew or suspected that Morrison was even considering seeking a search warrant for the Putrus brothers' properties. In fact, they have not cited any evidence that Benitez was told anything of substance about Morrison's investigation. In short, while the Putrus brothers have identified evidence suggesting that Benitez made a false statement to Morrison, they have not cited evidence that meaningfully connects Benitez to the search warrant application process.

The two cases that the Putrus brothers identify as their strongest authority do not clearly establish that a non-affiant officer may be liable under *Franks* where, like

34

Benitez, the plaintiffs fail to cite evidence connecting the non-affiant officer to the search warrant application process. The case the Putrus brothers primarily rely on is the Sixth Circuit's unpublished decision in *McCallum v. Geelhood*, 742 F. App'x 985 (6th Cir. 2018). But that case cannot serve as clearly established law sufficient to defeat Benitez's qualified immunity defense because it is unpublished. *See Eastep v. City of Nashville, Tenn.*, 156 F.4th 819, 833 (6th Cir. 2025) ("And, in the spirit of giving fair notice of conduct deemed to violate a constitutional right, unpublished decisions will not suffice to show that a right is clearly established.") (citing *Bell v. Johnson*, 308 F.3d 594, 611 (6th Cir. 2002)).

In any event, *McCallum* does not address an officer in Benitez's situation. In *McCallum*, one officer submitted an affidavit in support of an application for a search warrant in which she knowingly and falsely claimed that she had directly received information from an informant when, in fact, a second officer had allegedly interacted with the informant. *See McCallum*, 742 F. App'x at 987–89, 993. The second officer reviewed the affidavit before the first officer submitted it, and thus the second officer knew that the first officer was submitting a false affidavit. *See id.* Benitez is unlike either of those officers. In contrast to the first officer, he did not submit a false affidavit. And unlike the second officer, he did not review a false search warrant affidavit and recognize its falsity before it was submitted. Indeed, as noted above, the Putrus brothers have not cited any evidence that he knew or

35

suspected that Morrison would be seeking a warrant and would be including in his affidavit the information he (Benitez) provided about the informant. The Putrus brothers thus cannot satisfy their burden to identify clearly established federal law by pointing to *McCallum*.

The same is true with respect to the Putrus brothers' next best case: *Metris-Shamoon v. City of Detroit*, 545 F.Supp.3d 506 (E.D. Mich. 2021). To begin, *Metris-Shamoon* does not constitute clearly established federal law because "as a general rule, a district court decision by itself cannot ordinarily clearly establish a law even of its own circuit." *Hughes v. City of N. Olmsted*, 93 F.3d 238, 241 (6th Cir. 1996). *See also Frey v. Town of Jackson, Wyoming*, 41 F.4th 1223, 1235 (10th Cir. 2022) (explaining that "[a] single case from a district court does not show the 'weight of authority' required to clearly establish law").

Moreover, *Metris-Shamoon* does not address possible *Franks* liability for an officer in Benitez's situation. The primary alleged wrongdoer in *Metris-Shamoon* was an officer who swore in a search warrant affidavit that he (1) was "tipped off" to certain illegal conduct by a confidential informant and (2) "conduct[ed] independent surveillance" that "corroborated" the informant's tip. *Metris-Shamoon*, 545 F.Supp.3d at 513, 517–18. The court concluded that evidence presented by the plaintiffs "create[d] a reasonable dispute of material fact as to whether [the officer]" intentionally lied with respect to both of those claims. *Id.* at 517. Benitez is unlike

36

the officer in *Metris-Shamoon* because he did not personally make any false statements in a search warrant affidavit and because, as noted above, the Putrus brothers have not identified any evidence that Benitez knew that his statements to Morrison would be included in a search warrant affidavit.

Finally, the Putrus brothers suggest that Benitez is not entitled to qualified immunity on their search and seizure claim because there are "numerous factual disputes" underlying that claim. (Resp., ECF No. 110, PageID.2745-2746.)  But while disputes of fact are often enough to preclude summary judgment, that is not the case in the context of qualified immunity.  As the Sixth Circuit explained in a decision quoted by the Putrus brothers, a factual dispute precludes summary judgment on a qualified immunity defense where the dispute concerns "whether the defendants committed acts *that allegedly violated clearly established rights.*" *Margeson v. White Cnty., Tenn.*, 579 F. App'x 466, 470 (6th Cir. 2014) (emphasis added).  Stated another way, a factual dispute precludes summary judgment in favor of a defendant on his qualified immunity defense only where resolving that dispute in plaintiff's favor would result in a set of facts *that amounts to a violation of clearly established federal law.*  Since the Putrus brothers have failed to identify the required clearly established federal law with respect to Benitez, they cannot defeat his qualified immunity defense based upon the purported disputes of fact.

<div align="center">***</div>

<div align="center">37</div>

The Court pauses here to note the narrowness of its holding with respect to Benitez.  The Court is *not* holding that Benitez's alleged conduct – making a false statement to a fellow investigator that that investigator later includes in a warrant application – does not violate *Franks*.  The Court is not even reaching that question. The Court holds only that Benitez is entitled to qualified immunity because the Putrus brothers have failed to carry their burden of showing that Benitez's alleged conduct violated clearly established federal law.

The Court recognizes that there may well be good reason for holding that Benitez's purported conduct *does* violate *Franks*.  Indeed, a contrary holding – one immunizing investigators from *Franks* liability so long as they are not directly connected to the warrant application process – risks creating perverse incentives for investigators to feed each other false information that could be used to strengthen each other's search warrant affidavits.  The Court leaves for another day the task of answering whether Benitez's alleged conduct of lying to another investigator – which is plainly troubling – violates *Franks*.

## C

The Court next turns to the Putrus brothers' claims in Count II of the First Amended Complaint that Benitez and Morrison are liable under Section 1983 for false arrest.  Benitez and Morrison again argue that they are entitled to qualified immunity with respect to this claim.  The Court agrees.

"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005). Here, at the hearing on Defendants' second summary judgment motion, counsel for the Putrus brothers candidly – and properly – conceded that there *was* probable cause to arrest the Putrus brothers at the scene of the Second Raid based upon the discovery of a substantial amount of marijuana in the dispensary. That concession is fatal to their false arrest claim.

The Putrus brothers counter that the discovery of the marijuana cannot establish the required probable cause to arrest because that discovery was the "fruit of the poisonous tree." More specifically, they argue that the officers discovered the marijuana while executing a search warrant that had been obtained through the submission of an affidavit (Morrison's) that contained materially false statements about a confidential informant. But this theory falls apart when put through the traditional *Franks* framework.

Under *Franks*, "once a plaintiff makes [a] showing" that an officer's warrant contained a false statement that was deliberately made or made with a reckless disregard for the truth, "the Fourth Amendment requires [a] court to 'set aside the [false] statements and include the information omitted in order to determine whether the affidavit is still sufficient to establish probable cause.'" *McCallum*, 742 F. App'x

at 991 (quoting *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010)). Here, when the Court removes from Morrison's affidavit the one paragraph that references Benitez's informant, the affidavit is still more than sufficient to establish probable cause to search *the dispensary* for marijuana. Even without the statements about the informant, Morrison's affidavit described his substantial surveillance of the dispensary, his observations of individuals coming in and out of the dispensary, and his belief that based on those observations and years of experience, he believed there were narcotics being sold at that establishment. (*See* Morrison Aff., ECF No. 106-5.) That information was sufficient to clear the "low bar" of probable cause. *United States v. Moore*, 999 F.3d 993, 996 (6th Cir. 2021). Indeed, the Putrus brothers do not appear to argue otherwise. Instead, they stress that the affidavit did not establish probable cause to search *the check cashing/cell phone business*. (*See* Resp., ECF No. 110, PageID.2735-2736, 2740.) Because the untainted portions of Morrison's affidavit were sufficient to establish probable cause to search the dispensary, that search was lawful, and their arrest based upon the marijuana found during that search was lawful.

For all of these reasons, the Putrus Brothers' false arrest claim fails.

**D**

**1**

Next, in Count III of the First Amended Complaint, the Putrus brothers bring a malicious prosecution claim against Rodriguez, Benitez, and Morrison under Section 1983. In this claim, the Putrus brothers assert that the Defendant Officers are liable for malicious prosecution because (1) they were responsible for the initiation of the federal prosecution against them and (2) that prosecution was not supported by probable cause. The Defendants are entitled to qualified immunity with respect to this claim.

**2**

To prevail on a malicious prosecution claim under Section 1983, the Putrus brothers must show: "(1) a criminal prosecution was initiated against [them] and the [Defendants] made, influenced, or participated in the decision to prosecute; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceeding, [they] suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceeding was resolved in [their] favor." *Johnson v. Moseley*, 790 F.3d 649, 654 (6th Cir. 2015).

**3**

The Court begins with the malicious prosecution claim against Officer Rodriguez. As explained above, Rodriguez is the officer who swore out the criminal

Complaint against the Putrus brothers for conspiracy to distribute and to possess with intent to distribute controlled substances.  At the time he did so, he had been informed that the substances seized from the Putrus brothers' properties had tested positive for controlled substances in the DPD in-house lab.  (As noted above, the final test results from the DEA-affiliated lab indicating that the substances were not illegal drugs did not become available until well after Rodriguez sought the Complaint.)

During the first summary judgment hearing in this case, counsel for the Putrus brothers all but conceded that Rodriguez was entitled to qualified immunity because he sought the criminal Complaint based upon positive in-lab drug tests. (*See* 11/19/2024 Hr'g Tr., ECF No. 103, PageID.2302-2306.)   Indeed, counsel acknowledged that, at that time, he was not aware of any case in which an officer was held liable for malicious prosecution for signing a criminal Complaint "under circumstances that look anything like this" – an admission that counsel admitted was "most likely" "fatal" to the Putrus brothers' malicious prosecution claim against Rodriguez. (*Id.*, PageID.2306.)  As of today, the Putrus brothers still have not cited any case in which an officer was held liable for malicious prosecution where he sought drug charges based upon positive in-lab drug tests.  Rodriguez is therefore entitled to qualified immunity.

42

Benitez and Morrison are entitled to qualified immunity for the same reason. The Putrus brothers cannot hold them liable without citing any authority in which an officer has been held liable for malicious prosecution based upon the officer's initiation of a drug prosecution that was supported by positive in-lab drug test results.

**E**

Finally, the Court turns to Putrus brothers' municipal liability claim against the City of Detroit. This claim is brought pursuant to the Supreme Court's decision in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). At the hearing on Defendants' second summary judgment motion, counsel for the Putrus brothers clarified that this claim is based upon a failure-to-supervise theory. The Putrus brothers contend that even though the City was aware of a "pattern and practice of criminal misconduct in the narcotics unit" (First Am. Compl. at ¶ 232, ECF No. 38, PageID.530), the City failed to supervise its narcotics investigators with respect to the search warrant application process and the keeping of records related to warrant applications (such as records related to confidential informants). This claim fails for two independent reasons.

First, where, as here, "when [a] complaint alleges municipal liability based on a policy of inaction" – such as a failure to supervise – 'the absence of a *clearly established* right spells the end of the *Monell* claim.' That's because a policy of inaction relies on the municipality's deliberate indifference. And a municipality

43

cannot *deliberately* shirk a constitutional duty unless that duty is clear." *Martinez v. Wayne Cnty., Mich.*, 142 F.4th 828, 844 (6th Cir. 2024) (cleaned up and internal citations omitted) (applying rule to failure-to-supervise claim). As explained above, the Putrus bothers have not shown that any of the Defendants violated their clearly established rights. Their failure to identify such a violation, "alone spells the end of [their] *Monell* claim." *Id.* (internal punctation and citation omitted).

Second, the Putrus brothers cannot establish the elements of their failure-to-supervise claim. The elements of that claim are "that (1) the municipality's training or supervision was inadequate for the tasks that its officers must perform, (2) the inadequacy was the result of the municipality's deliberate indifference, and (3) the inadequacy was closely related to or caused the constitutional injury. *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 286–87 (6th Cir. 2020). The Sixth Circuit has explained that a plaintiff may prove "deliberate indifference to inadequate supervision" in one of two ways: by showing "either (1) a pattern of unconstitutional conduct demonstrating that the municipality was on notice that its supervision of its employees was inadequate and likely to cause injury, but did nothing; or (2) a single violation of rights, accompanied by evidence that the failure to supervise presented an obvious potential for such a violation. *See Austin v. Mosley*, No. 23-1425, 2025 WL 448879, at * 3–4 (6th Cir. Feb. 10, 2025).

44

The Putrus brothers seek to proceed under the first theory.  They attempt to prove that the City ignored a pattern of unconstitutional conduct by highlighting the "massive lack of oversight and supervision" and the resulting problems that were uncovered by Operation Clean Sweep.[9] (Resp., ECF No. 110, PageID.2732.)  But Operation Clean Sweep was not initiated until several years *after* the alleged wrongful conduct here.  The fact that the City may have discovered misconduct years *after* the fact says nothing about whether the City was on notice of a pattern of unconstitutional conduct at the time it was happening.

The Putrus brothers also attempt to prove the City's knowledge of its inadequate supervision through the deposition testimony of Captain Dietrich Lever of the DPD, who testified on behalf of the City pursuant to Federal Rule of Civil Procedure 30(b)(6).  (*See* Lever Dep., ECF No. 110-12.)  The Putrus brothers focus on Captain Lever's testimony that Operation Clean Sweep's criticisms of the DPD's use of unregistered informants was "concerning."  (Resp., ECF No. 110,

---

[9] To the extent that the Putrus brothers attempted to pivot during the hearing on Defendants' second summary judgment motion and frame their failure-to-supervise theory as falling under the second option described in *Austin* (*i.e.*, as a single violation that presented an obvious potential for a constitutional violation), it is too late for them to do so.  A party may not change their theory of liability and raise new arguments after briefing on a motion is complete. *Cf. Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief— they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration. [....] As a matter of litigation fairness and procedure, then, we must treat [such issues] as waived.") (internal citation omitted).

PageID.2728 (citing Lever Dep., ECF No. 110-12, PageID.2856).)  But the Putrus brothers have not identified any evidence that Captain Lever or any other supervisor with the DPD knew of the alleged misconduct uncovered by Operation Clean Sweep *at the time it was happening* and failed to take action.  Thus, Captain Lever's reaction to the Operation Clean Sweep findings – years after the Second Raid – does not establish that at the time of that raid, the City was on notice that its supervision of the warrant process or supervision of its officers was inadequate.  For all of these reasons, the Putrus brothers may not proceed on their municipal liability claim.

The Sixth Circuit reached that same conclusion under similar circumstances in *Austin, supra*.  In *Austin*, as here, the plaintiff brought a failure-to-supervise claim against the City of Detroit based on the wrongful conduct of the City's officers during the warrant process uncovered in Operation Clean Sweep.  The district court granted summary judgment in favor of the City, and the Sixth Circuit affirmed:

> Like the failure-to-train claim, Austin and Cook base their failure-to-supervise claim on inadequacies in the DPD's supervision over the search warrant process. *See id.*; R. 1, at 7-8. Indeed, the Operation Clean Sweep report identified the lack of "supervisory review of search warrants" as a main "area[ ] of concern." R. 65-2, PageID 1348. The City, Plaintiffs argue, deliberately ignored this problem. They also suggest that the DPD's decision to staff the MVU with personnel from the Narcotics Unit and its unwillingness to create new supervisory positions and safeguards following the 2014 FBI investigation constitute further evidence that the City's supervision was deficient and that it deliberately ignored such deficiencies. Once again, we need not determine whether the City's

> supervision was inadequate because the deliberate indifference prong is dispositive.
>
> <div align="center">[….]</div>
>
> On this record, for largely the same reasons as the failure-to-train claim, Austin and Cook have not proffered evidence sufficient to raise a triable issue as to deliberate indifference. The Operation Clean Sweep finding that there was a lack of supervision over the warrant process was not published until 2021, and the underlying investigation began in 2019. The only pre-2018 evidence cited by the Plaintiffs is the 2014 FBI investigation and the resultant convictions. As discussed above, the Plaintiffs have not adduced any evidence that the investigation or its resulting convictions involved falsification of search affidavits or similar misconduct regarding the search warrant process. A reasonable jury could not find that the City was on notice of prior instances of "similar" violations demonstrating deficient supervision over the warrant process. *Connick*, 563 U.S. at 62. The district court did not err in granting the City summary judgment on Plaintiffs' failure-to-supervise claim.

*Id.* at *4. For all of these same reasons, the Putrus brothers' failure-to-supervise claim fails here. The City is therefore entitled to summary judgment on this claim.

<div align="center">V</div>

Before concluding, the Court addresses the Putrus brothers' remaining claims for malicious prosecution and the intentional infliction of emotional distress brought under state law. The Court declines to exercise supplemental jurisdiction over those claims.

<div align="center">47</div>

As the Sixth Circuit has explained, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996). *See also Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009). Supplemental jurisdiction "is a doctrine of discretion, not of plaintiff's right." *Habich v. City of Dearborn*, 331 F.3d 524, 535 (6th Cir. 2003) (internal quotation marks omitted) (affirming district court's refusal to assert supplemental jurisdiction). Indeed, district courts have "broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims." *Pinney Dock & Transport Co. v. Penn Cent. Corp.*, 196 F.3d 617, 620 (6th Cir. 1999).

Here, the court exercises its "broad discretion" to decline to exercise supplemental jurisdiction over the Putrus brothers' remaining state-law claims because it is dismissing all of their claims over which it has original jurisdiction. Those claims – and the related and potentially complex questions of state law – are best resolved in the first instance by the state courts. The Court therefore **DISMISSES** the Putrus brothers' state-law claims **WITHOUT PREJUDICE**.

## VI

For all of the reasons explained above, the Court **GRANTS IN PART** Defendants' second motion for summary judgment. The motion is **GRANTED** to the extent that it seeks summary judgment on the Putrus Brothers' federal claims.

48

Those claims are **DISMISSED WITH PREJUDICE**.   The Court declines to

exercise supplemental jurisdiction over the Putrus Brothers' state-law claims.  Those

claims are **DISMISSED WITHOUT PREJUDICE**.

    **IT IS SO ORDERED**.

<div style="margin-left:45%">

s/Matthew F. Leitman  
MATTHEW F. LEITMAN  
UNITED STATES DISTRICT JUDGE

</div>

Dated:  March 31, 2026

    I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 31, 2026, by electronic means and/or ordinary mail.

<div style="margin-left:45%">

s/Holly A. Ryan  
Case Manager  
(313) 234-5126

</div>